UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>   v.<br><br>DAVID PAUL MARTINEZ,<br><br>       Defendant. | Case No. 17-CR-00257-LHK-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 16 |

On May 23, 2018, Defendant David Paul Martinez ("Defendant") filed a Motion to Suppress Evidence. ECF No. 16 ("Mot."). The government filed an opposition on June 14, 2018, ECF No. 17 ("Opp."), and Defendant filed a reply on July 9, 2018. ECF No. 20 ("Reply"). The Court held a hearing on July 18, 2018. Having considered the submissions and oral arguments of the parties, the record in this case, and the relevant law, the Court DENIES Defendant's motion to suppress.

## I.    BACKGROUND

At approximately 4:15 p.m. on January 23, 2017, while on duty monitoring traffic on Highway 156, San Benito County Deputy Sheriff Matthew Creager saw a white SUV with darkly tinted front side windows in apparent violation of California Vehicle Code § 26708(a)(1). Mot.

Exh. C at 7–8. Deputy Creager also observed that the SUV had a paper rear license plate in apparent violation of California Vehicle Code § 5200(a). *Id.* at 8. Based on these traffic violations, Deputy Creager pulled the SUV over. *Id.* Shortly afterwards, another deputy arrived to serve as Deputy Creager's backup unit. *Id.*

Deputy Creager walked up to the driver's side of the SUV while the backup deputy walked up to the passenger side. *Id.* As Deputy Creager approached the driver's door, the driver rolled down his window and identified himself as Defendant. *Id.* Deputy Creager immediately "smell[ed] a strong odor of marijuana emanating from the passenger compartment of the vehicle." *Id.* Deputy Creager also recognized Defendant "from a prior contact." *Id.*

Deputy Creager then asked Defendant to get out of the car and stand in front of Deputy Creager's police cruiser. *Id.* Defendant complied, and the backup deputy pat searched Defendant and did not find any weapons on Defendant's person. *Id.* Next, Deputy Creager asked Defendant how much marijuana Defendant had in the car. Mot. Exh. B at 3. Defendant responded: "Honestly, I have like a little sack and a little blunt. I haven't even been smoking it either." *Id.* at 4. Deputy Creager mentioned that the inside of Defendant' car smelled like marijuana, and then asked Defendant if there was "[a]nything illegal in the car." *Id.* Defendant replied, "[n]o go [a]head, no," and gestured towards the car. Mot. Exh. A at 2:47; Mot. Exh. B at 4. Deputy Creager informed Defendant that Deputy Creager would check the car, to which Defendant again responded, "[g]o ahead." Mot. Exh. B at 4. Defendant then added, "[t]he weed is in the center console," and made a lifting motion with his hand. Mot. Exh. A at 2:54; Mot. Exh. B at 4.

Deputy Creager entered the car through the front passenger door. Mot. Exh. A at 3:04. Deputy Creager saw several items located on the center console, including a wallet, cash, a cell phone, and other personal items. Mot. Exh. C at 9. Deputy Creager also observed "several seeds lying on top of the center console" that "appeared to be marijuana seeds." *Id.* Then, Deputy Creager opened the center console and "located a clear, plastic sandwich style bag that contained a green, leafy substance," as well as a "'blunt' lying next to the bag" that contained the same "green, leafy substance." *Id.* Deputy Creager recognized the leafy substance inside the bag and blunt to

United States District Court
Northern District of California

be marijuana. *Id.* "The marijuana and blunt had a total gross weight . . . of 6.11 grams." *Id.*

Deputy Creager continued searching the center console. While doing so, Deputy Creager noticed that an interior panel of the center console appeared to be loose. *Id.* Deputy Creager noted in his incident report that he has "encountered several vehicles with 'loose' consoles . . . in the past and know[s] that many persons involved in the illegal transportation of drugs, narcotics, firearms and money will hide items underneath center consoles." *Id.* As such, Deputy Creager lifted the loose panel and "pulled it out [of the console] easily." *Id.* Deputy Creager then "looked into the void underneath" where the loose panel had been and saw "a silver and black colored handgun." *Id.*

During this time period, Deputy Creager also examined the rear paper license plate. Mot. Exh. C at 8. Deputy Creager discovered a permanent license plate underneath the paper plate. *Id.* Then, Deputy Creager "had Netcom run the plate," and was informed by Netcom "that the vehicle had expired registration since" October 2016, which was about three months before Deputy Creager's January 23, 2017 search of Defendant's vehicle. *Id.* at 9.

Shortly after discovering the handgun in Defendant's center console, Deputy Creager and the backup deputy placed Defendant under arrest and handcuffed Defendant without incident. *Id.* Deputy Creager completed his search of Defendant's car about four and a half minutes after Deputy Creager pulled Defendant's car over, *see* Mot. Exh. A at 5:40, and Defendant was arrested and handcuffed less than one minute after Deputy Creager concluded his search. *See id.* at 6:25. The handgun found in the interior of Defendant's center console was later identified as a Beretta Model 96 .40 caliber handgun. Mot. Exh. C at 9–10. The handgun contained a loaded high capacity magazine. *Id.* at 9.

About one week later, on January 31, 2017, Deputy Creager applied for and obtained a warrant to search Defendant's residence from a judge on the Superior Court for the County of San Benito. *See* Mot. Exh. H. Deputy Creager submitted an affidavit in support of the search warrant application. *See id.* In his affidavit, Deputy Creager recounted the details surrounding his traffic stop and search of Defendant's vehicle, including the fact that Deputy Creager found a firearm in

the interior of the center console. *See id.* at 7–9. Deputy Creager also stated in his affidavit that, upon reviewing Defendant's criminal history, Deputy Creager "discovered that [Defendant] [had] been convicted of [misdemeanor] domestic violence" in 2012, which made it illegal for Defendant to own or possess any firearms. *Id.* at 9; *see* Mot. at 1 (stating that "in 2012," Defendant "was convicted of a misdemeanor [domestic violence] violation of Cal[ifornia] Penal Code § 243(e)(1)"); ECF No. 1 at 1 (same).

Deputy Creager's search warrant affidavit also contained a "gang heading" section. Mot. Exh. H at 6. Deputy Creager explained in this section that he had "participated in hundreds of gang related arrests and investigations." Mot. Exh. H at 6. He further explained that, based on his training and experience, he knew that "members of the Norteno criminal street gang often show their allegiance to the gang by displaying the Huelga Bird, the color red, the Roman numeral XIV, the roman numeral IV, the number 4, [and] the number 14," and that many Nortenos "often wear clothing to include sports attire depicting logos and/or colors that show affiliation to the Norteno criminal street gang." *Id.*

Thereafter, Deputy Creager highlighted some details about Defendant that, in Deputy Creager's view, suggested that Defendant might be affiliated with the Norteno street gang. First, Deputy Creager stated Defendant was wearing a "Cincinatti [sic] Reds baseball hat with red letter 'C' and a red bill" and had "money symbol" tattoos on his left shoulder and right forearm. *Id.* Deputy Creager explained that the "letter 'S' with lines through it is a sign of disrespect to the Sureno criminal street gang." *Id.* Second, Deputy Creager noted that Defendant "had a brown wallet depicting the letters 'SF' inside of his vehicle." *Id.* Deputy Creager explained that "Norteno criminal street gang members often wear clothing, have tattoos[,] or posses items depicting the San Francisco Giants or San Francisco 49ers logos," and that based on conversations with "multiple gang members," Deputy Creager knew "that the letters 'SF' stand for 'Scrap Free,'" and that "'Scrap' is a derogatory term commonly used by Norteno criminal street gang members to describe members of the rival Sureno criminal street gang." *Id.* Third, Deputy Creager noted that Defendant's "white cell phone had a red protective case," and that "[t]he color

4

red is commonly displayed by" Nortenos. Finally, Deputy Creager stated the following:

> It should be noted that I was present when jail staff asked [Defendant] where he houses when he stays at the county jail. [Defendant] advised that he houses in "B" pod. Based on my training, knowledge and experience, I know that "B" pod is where Norteno gang members are housed. I also confirmed that "B" pod was still a pod where Nortenos were being housed with jail staff on the day [Defendant] was booked.

*Id.*

Later in his search warrant affidavit, Deputy Creager stated that, based on his training and experience, he knew that gang members often possess multiple firearms and weapons, and relatedly, that gang members often use weapons to "attack other gang members or for their protection from" members of rival gangs. *Id.* at 10. Deputy Creager also stated that it was his belief that "further gang indicia and/or possession of illegal firearm(s) and/or firearms related items will be discovered" at Defendant's residence. *Id.* As a result, upon issuance, the search warrant authorized seizure of the following from Defendant's residence:

> 1. Evidence of Gang membership: Any evidence of association or membership in the "Norteno" criminal street gang, including but not limited to:
>
>    a. Clothing related to association or membership in a criminal street gang;
>
>    b. Music related to criminal street gangs and criminal street gang activities;
>
>    c. Photographs and/or videos of associates or members of criminal street gangs flashing gang signs, wearing gang clothing, and/or displaying weapons;
>
>    d. Writings, letters, and/or newspapers which reference the activities and/or membership of a criminal street gang;
>
>    e. Rosters or telephone lists which show the associates and members of a criminal street gang;
>
>    f. Any of the above items stored in an electronic or digital format in any storage device, including but not limited to CDs, DVDs, floppy disks, hard drives, Flash drives, USB devices, cellular telephones, MP3 players, digital picture viewers, computers, games consoles and

any other electronic storage device;

g. Weapons including firearms, knives, ammunition, holsters, gun cases, cleaning kits and firearms related accessories.

h. Police scanners.

2. Evidence tending to show dominion and control of the area where the evidence is located.

*Id.* at 3–4.

The search warrant was executed on February 10, 2017. Mot. Exh. J at 2. During the search, officers discovered and seized three firearms—a 20 gauge shotgun, a .22 caliber sawed off rifle, and a .223 caliber Bushmaster AR-15 assault rifle—along with a number of firearm-related items (i.e. magazines) and a substantial amount of ammunition. *Id.* at 3. Various other items were also seized from Defendant's residence, including several articles of clothing, sizable quantities of narcotics and related paraphernalia, a "slim jim" tool, and two black ski masks. *Id.* at 2–4.

On May 9, 2017, Defendant was indicted in this criminal action on two counts of possessing firearms as a prohibited person in violation of 18 U.S.C. § 922(g)(9). ECF No. 1.

## II.     DISCUSSION

Defendant now moves to suppress all of the evidence obtained during both (1) the January 23, 2017 search of his vehicle; and (2) the February 10, 2017 search of his residence. *See* Mot. Specifically, Defendant argues that "[b]ecause the searches of his vehicle and home violated the Fourth Amendment," the fruits of those searches must be suppressed. Mot. at 1. The Court first addresses the search of Defendant's vehicle. Then, the Court addresses the subsequent search of Defendant's residence.

### A. Search of Defendant's Car

First, Defendant argues that the evidence that was obtained from Deputy Creager's search of Defendant's vehicle—most significantly, the firearm that was found in the interior of the center console—should be suppressed. Defendant does not dispute the lawfulness of the traffic stop that preceded the search. *See* Mot. at 8–13. Instead, Defendant contends that suppression is warranted because the search of Defendant's vehicle was unlawful under the Fourth Amendment. *See id.*

The government argues that Deputy Creager's search of Defendant's vehicle was valid under the automobile exception to the warrant requirement. Opp. at 6–8. In the alternative, the government contends that the evidence found during the search of Defendant's vehicle should not be suppressed because "Defendant voluntarily consented to a search of the entire interior of [Defendant's] vehicle." *Id.* at 9–11. For the reasons stated below, the Court agrees with the government that Deputy Creager's search of Defendant's vehicle was valid under the automobile exception, and therefore need not address the government's voluntary consent argument.

Fourth Amendment jurisprudence has long viewed vehicles as presenting different safety concerns and privacy expectations than stationary residences. While the United States Supreme Court has recognized that individuals have privacy interests in their vehicles, it has found that those interests are due a lesser degree of protection for two reasons: (1) the exigency that accompanies the "ready mobility" of vehicles, and (2) the reduced expectations of privacy associated with "the pervasive regulation of vehicles capable of traveling on the public highways." *Collins v. Virginia*, 138 S. Ct. 1663, 1669–70 (2018) (quoting *California v. Carney*, 471 U.S. 386, 390–91 (1985)).

To account for the altered balance of interests in this context, the U.S. Supreme Court long ago established the automobile exception to the warrant requirement. Under that exception, an officer's search of an automobile can be reasonable without first securing a warrant. *Carroll v. United States*, 267 U.S. 132, 153 (1925). More specifically, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). However, the scope of the ensuing warrantless search may extend only to "the places in which there is probable cause to believe that [the object of the search] may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982); *see also California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."). The government bears the burden of proving that the automobile exception applies. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).

7

In the context of the automobile exception, there is a body of case law that specifically addresses the validity of car searches that are conducted upon detection of the presence—or possible presence—of marijuana. Specifically, "[t]he Ninth Circuit and district courts within this circuit have repeatedly found that the odor of marijuana alone" provides probable cause to search a vehicle "for additional contraband." *United States v. Collins*, 2018 WL 306696, at *3 (N.D. Cal. Jan. 5, 2018). For example, in affirming a district court's denial of a defendant's motion to suppress, the Ninth Circuit in *United States v. Solomon* held that by virtue of "smell[ing] marijuana" upon entering the defendant's car, an officer had "probable cause to search the inside of [the defendant's] car and, after finding no marijuana there, the trunk." 528 U.S. 88, 91–92 (9th Cir. 1975); *see also United States v. Johnson*, 224 F. Supp. 3d 881, 885 (N.D. Cal. 2016) ("Our court of appeals has stated 'the fact that an agent familiar with the odor of marijuana smelled such an odor emanating from the automobile when he jumped in to stop it alone was sufficient to constitute probable cause for a subsequent search [of the automobile] for marijuana.'" (quoting *United States v. Barron*, 472 F.2d 1215, 1217 (9th Cir. 1973))). As such, courts have also upheld "searches under the automobile exception based on the odor *and sight* of even small amounts of marijuana." *Collins*, 2018 WL 306696, at *4 (emphasis added).

In the instant case, the government argues that Deputy Creager's search of the passenger compartment of Defendant's vehicle and the adjoining center console was lawful because Deputy Creager had probable cause "to believe that contraband or evidence of a crime would be found" in those portions of Defendant's vehicle. Mot. at 6. The government contends that this probable cause existed because (1) while standing next to Defendant's vehicle, Deputy Creager "smell[ed] a strong odor of marijuana emanating from the passenger compartment of [Defendant's] vehicle" immediately after Defendant rolled down his driver's side window, Mot. Exh. H at 7; Opp. at 6; and (2) in response to a question from Deputy Creager, Defendant admitted that he had "a little sack and a little blunt" of marijuana, and subsequently followed up his answer by stating that "[t]he weed is in the center console." Mot. Exh. B at 4; Opp. at 6; *see* Mot. Exh. H at 7 ("I mentioned the smell of marijuana inside of the vehicle and [Defendant] told me that he had a small

United States District Court
Northern District of California

bag of marijuana and a 'blunt' inside of the vehicle . . . [Defendant] explained that the marijuana was inside of the center console."). The government further points to other facts in support of probable cause, including: (1) that Deputy Creager observed what "appeared to be marijuana seeds" "on top of the center console," Mot. Exh. H at 8; (2) that Deputy Creager found marijuana in a "clear, plastic sandwich style bag," as well as a blunt of marijuana, in the center console, *id.*; (3) that while searching the center console, Deputy Creager noticed that a panel of the center console was loose, *id.*; and (4) that Deputy Creager had "encountered several vehicles with 'loose' consoles . . . throughout [his] career in law enforcement" and that based on those experiences, Deputy Creager knew that "persons involved in the illegal transportation of drugs, narcotics, firearms and money" have hid contraband inside "loose" center consoles in the past. *Id.*

The Court agrees with the government that, based on the totality of the circumstances, Deputy Creager's search of Defendant's vehicle was supported by probable cause. In *United States v. Newman*, 563 F. App'x 539 (9th Cir. 2014), the Ninth Circuit upheld a very similar search under the automobile exception. Specifically, in *Newman*, a police officer started searching the defendant's car during a traffic stop after (1) "first smelling the odor of marijuana" emanating from the vehicle; (2) "observing a canine alert to . . . the center console"; and (3) hearing the defendant "admit[] there was marijuana in the vehicle." *Id.* at 542. The officer then "found a green leafy substance consistent with marijuana in the center console." *Id.* Thereafter, the officer "ran his hand along the vehicle's headliner and detected paper positioned between the headliner and the ceiling of the vehicle." *Id.* Based on his previous experiences of finding "narcotics and other contraband concealed in headliners," the officer "became suspicious that illegal contraband was hidden in the headliner" of the defendant's car, and therefore searched the headliner for contraband. *Id.* The defendant argued on appeal that the government "failed to meet its burden of justifying the warrantless search of his vehicle." *Id.* at 540. In rejecting the defendant's argument, the Ninth Circuit held that the officer's search was valid under the automobile exception because, "[b]ased on the information known to [the officer] at the time he searched the vehicle, coupled with his experience and training, there was a fair probability he would find either drugs or

9

evidence relating to drug crimes secreted in the headliner of [the defendant's] vehicle." *Id.* at 541.

Like the officer in *Newman*, Deputy Creager started searching Defendant's vehicle after (1) smelling a strong odor of marijuana emanating from the passenger compartment; (2) hearing Defendant admit that there was marijuana in the car; and (3) receiving an indication that the marijuana was located in the center console of the car. Further, again like in *Newman*, Deputy Creager found marijuana in the center console, but continued searching for contraband and eventually noticed that a panel of the center console was loose. Finally, much like how the paper on the headliner appeared suspicious to the officer who conducted the search in *Newman*, the loose console panel in Defendant's car raised Deputy Creager's suspicions because, based on Deputy Creager's past experiences with "loose" consoles, such consoles are sometimes used as places to hide contraband. As a result, "[b]ased on the information known to [Deputy Creager] at the time he searched [Defendant's] vehicle, coupled with his experience and training, there was a fair probability he would find either drugs" or other contraband in the vehicle's passenger compartment and the adjoining center console. *Newman*, 563 F. App'x at 541. Given that under Ninth Circuit law, "the odor of marijuana alone" provides probable cause to search a vehicle "for additional contraband," *Collins*, 2018 WL 306696, at *3, and in light of the fact that Deputy Creager smelled "a *strong* odor of marijuana emanating from the passenger compartment of [Defendant's] vehicle," Mot. Exh. H at 7 (emphasis added), Deputy Creager had probable cause to continue his search for contraband even after finding 6.11 grams of marijuana in the center console, and "was not obligated to accept as true" any implication by Defendant that the marijuana in the center console was the only marijuana in the car. *United States v. McCall*, 268 F. App'x 646, 648 (9th Cir. 2008) ("In any event, the officer was not obligated to accept as true what the driver claimed, that the amount of marijuana in the car was merely a 'roach.'").

Defendant argues that Deputy Creager's search of Defendant' vehicle was unlawful because under recent California legislation, mere possession of less than 28.5 grams of marijuana is no longer unlawful, *see* Cal. Health & Safety Code § 11362.1(a), and "possession of an open container containing less than 28 grams of marijuana"—like the blunt found in Defendant's center

console—while driving a car is "only an infraction, carrying the potential of a small fine." Mot. at 11 (citing Cal. Veh. Code § 23222(b) and Cal. Health & Safety Code § 11362.1(a)). Thus, Defendant appears to assert that because the blunt found in Defendant's car could only render Defendant guilty of "a minor infraction," neither that small amount of marijuana nor the odor of marijuana emanating from the passenger compartment of Defendant's vehicle provided Deputy Creager with probable cause to continue searching for additional marijuana or other contraband. *Id.*; *see* Reply at 4 ("Once Deputy Creager found a lawful amount of the marijuana in the armrest . . . there were no facts indicating a 'fair probability' that additional marijuana or contraband would be found anywhere else in [Defendant's] vehicle.").

Defendant's argument is not well-taken. In *Collins*, United States District Judge Susan Illston of the Northern District of California rejected a similar argument and concluded that the officers in *Collins* "had probable cause to search [the] defendant's vehicle under the automobile exception once they saw a plastic bag containing" a less-than-criminal amount of marijuana. 2018 WL 306696, at *5. In doing so, Judge Illston noted that even California courts have upheld searches "under the automobile exception based on the odor and sight of *even small amounts of marijuana*, irrespective of state medical marijuana laws permitting the possession of up to eight ounces and *irrespective of state law making possession of up to 28.5 grams of non-medical marijuana an infraction only.*" *Id.* at *4 (emphases added) (citing *People v. Waxler*, 224 Cal. App. 4th 712, 715, 717 (2014), and *Strasburg*, 148 Cal. App. 4th at 1055–56, 1060). Further, in response to the defendant's argument that the officers lacked probable cause to search his vehicle because "the marijuana the officers saw was later determined to weigh less than" 28.5 grams, Judge Illston explained that "'neither the California Supreme Court nor the United States Supreme Court has limited the automobile exception to situations where the defendant possesses a *criminal* amount of contraband.'" *Id.* at *5 (internal quotation marks omitted) (quoting *Waxler*, 224 Cal. App. 4th at 723).

Similarly here, the fact that Deputy Creager found a less-than-criminal amount of marijuana in the center console of Defendant's car did not preclude Deputy Creager from having

11

United States District Court
Northern District of California

probable cause under the automobile exception to search the passenger compartment and the adjoining center console for additional, potentially unlawful amounts of marijuana. As the government correctly points out, even though possessing an open container of a small amount of marijuana while driving a vehicle may only be an infraction under California law, "California still criminalizes possession of marijuana in excess of" 28.5 grams, and that offense "is punishable by imprisonment in jail for up to six months." Opp. at 8 (citing Cal. Health & Safety Code § 11357(b)(2)).

This is particularly so because Deputy Creager smelled a "*strong* odor of marijuana emanating from the passenger compartment of [Defendant's] vehicle," Mot. Exh. H at 7 (emphasis added), and because "the odor of marijuana alone is sufficient provide probable cause for a vehicle search for marijuana." *Collins*, 2018 WL 306696 at *5 (citing *Barron*, 472 F.2d at 1217). In other words, the strong smell of marijuana emanating from the passenger compartment of Defendant's car, Defendant's own admission that there was marijuana in the car, and the presence of a small amount of marijuana in the center console raised a fair probability that there was a "criminal" amount—more than 28.5 grams—of marijuana somewhere in the vicinity of the passenger compartment of Defendant's car. As a result, Deputy Creager had probable cause to continue his search even after finding a less-than-criminal amount of marijuana in the center console of Defendant's vehicle.

Other courts have also rejected legality-based arguments similar to the one raised here by Defendant. For example, in *United States v. Robbins*, 2016 WL 6565922 (S.D. Cal. Nov. 3, 2016), the defendant argued that there was no probable cause to search the defendant's vehicle because, although the defendant admitted to having a small amount of marijuana, possession of a small amount of marijuana was "merely an 'infraction' and not an arrestable offense" under California law. *Id.* at *5. In rejecting the defendant's argument, the *Robbins* court first noted that the defendant "provide[d] no authority for the proposition that an infraction cannot give rise to probable cause," and then explained that "'a person of ordinary caution'" who is "'armed with the knowledge that there was marijuana in the car . . . would conscientiously entertain a strong

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

1   suspicion that even if defendant makes only personal use of the marijuana found in the passenger

2   area, he might stash additional quantities for future use'" elsewhere in the car.  *Id.* (quoting *People*

3   *v. Strasburg*, 148 Cal. App. 4th 1052, 1059 (2007)).

4       Finally, Defendant relies on this Court's order granting in part a defendant's motion to

5   suppress in *United States v. Chavez*, 2018 WL 3126444 (N.D. Cal. June 26, 2018).  Reply at 3–4.

6   However, contrary to Defendant's view, *Chavez* is inapposite.  In *Chavez*, even though the only

7   justification supporting a search of the defendant's car was the fact that an officer "smelled [a]

8   strong odor of marijuana emanating from the passenger compartment," the officers in *Chavez*

9   immediately "conducted a full search of [the defendant's] vehicle," wherein one officer

10  "conducted [a] search of the trunk and its contents" while two other officers "searched the front

11  passenger compartment of [the defendant's] vehicle."  2018 WL 3126444 at *2, *5.  The officers

12  found a backpack in the trunk, and subsequently found an assortment of contraband and other

13  incriminating items in the backpack, including "firearms, ammunition, cash, cocaine, marijuana,

14  and [a] digital scale."  *Id.* at *6.  The Court granted the defendant's motion to suppress the

15  evidence obtained from the backpack in the defendant's trunk.  *See id.*  Specifically, the Court

16  concluded that, while the fact that an officer "detected the smell of marijuana from the passenger

17  compartment . . . certainly established probable cause to believe that contraband was stored in the

18  passenger compartment, the odor [from the passenger compartment] did not raise a fair probability

19  that additional evidence would be uncovered in the trunk, let alone the backpack in the trunk."  *Id.*

20  at *5.  In other words, to reach its conclusion, the Court adhered to the well-established principle

21  that the scope of a warrantless search pursuant to the automobile exception may extend only to

22  "the places in which there is probable cause to believe that [the object of the search] may be

23  found."  *Ross*, 456 U.S. at 824.

24      In contrast, in the instant case, Deputy Creager did *not* search and find contraband in

25  Defendant's trunk.  Instead, Deputy Creager searched the passenger compartment and the

26  adjoining center console, and eventually found a firearm inside the interior of the console.

27  Further, as explained above, Deputy Creager had probable cause to search these portions of

28

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant's vehicle based on, inter alia, (1) the strong odor of marijuana emanating from the vehicle's passenger compartment; (2) Defendant's admission that he had marijuana in the center console; (3) the small amount of marijuana that was found inside the center console; and (4) the loose panel in the center console. Thus, unlike the officers in *Chavez*, Deputy Creager's search did not extend beyond "the places in which [Deputy Creager had] probable cause to believe that [marijuana] may be found." *Id.* As a result, Deputy Creager's search was valid under the automobile exception.

### A. Search of Defendant's Residence

As discussed above, Defendant's residence was searched pursuant to a warrant issued by a judge on the Superior Court for the County of San Benito. Defendant advances four arguments for why "all evidence obtained pursuant to th[is] search warrant must be suppressed." *See* Mot. at 13–25. Specifically, Defendant argues that (1) "the search warrant resulted from tainted evidence," *id.* at 14–15; (2) the search warrant "did not provide probable cause to believe that [Defendant] had committed any crime to which evidence in his house would be relevant," *id.* at 15–19; (3) the search warrant violated "the Fourth Amendment's particularity requirement," *id.* at 19–20; and (4) Deputy Creager intentionally or recklessly included false and misleading statements in his search warrant affidavit. *Id.* at 20–25.

The Court is not persuaded by any of Defendant's arguments. The Court will first address Defendant's particularity argument. Then, the Court discusses Defendant's assertion that Deputy Creager intentionally or recklessly included false statements in his search warrant affidavit. Next, the Court addresses Defendant's contention that "the search warrant was the fruit of tainted evidence." *Id.* at 14–15. Finally, the Court discusses Defendant's probable cause argument.

#### 1. Particularity

The Fourth Amendment requires search warrants to provide descriptions of the objects to be seized that are "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). This specificity requirement "prevents officers from engaging in general, exploratory

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

searches by limiting their discretion and providing specific guidance as to what can and cannot be searched and seized." *United States v. Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006). In evaluating whether a warrant is sufficiently particular, courts may consider one or more of the following factors: (1) "whether probable cause exists to seize all items of a particular type described in the warrant"; (2) "whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not"; and (3) "whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (citations omitted). As such, "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." *Id.*

As discussed above, the warrant in the instant case authorized seizure of the following from Defendant's residence:

> 3. Evidence of Gang membership: Any evidence of association or membership in the "Norteno" criminal street gang, including but not limited to:
>
> a. Clothing related to association or membership in a criminal street gang;
>
> b. Music related to criminal street gangs and criminal street gang activities;
>
> c. Photographs and/or videos of associates or members of criminal street gangs flashing gang signs, wearing gang clothing, and/or displaying weapons;
>
> d. Writings, letters, and/or newspapers which reference the activities and/or membership of a criminal street gang;
>
> e. Rosters or telephone lists which show the associates and members of a criminal street gang;
>
> f. Any of the above items stored in an electronic or digital format in any storage device, including but not limited to CDs, DVDs, floppy disks, hard drives, Flash drives, USB devices, cellular telephones, MP3 players, digital picture viewers, computers, games consoles and any other electronic storage device;

United States District Court
Northern District of California

g. Weapons including firearms, knives, ammunition, holsters, gun cases, cleaning kits and firearms related accessories.

h. Police scanners.

4. Evidence tending to show dominion and control of the area where the evidence is located.

Mot. Exh. H at 3–4. Moreover, Deputy Creager's search warrant affidavit identified numerous symbols, signs, and clothing characteristics that are suggestive of association or membership in the Norteno street gang, including, inter alia, "the Huelga Bird, the color red, the Roman numeral XIV, the roman numeral IV, the number 4, the number 14," and "sports attire depicting" these symbols and colors. *See id.* at 6.

Defendant argues that both the "gang membership" and the "dominion and control" categories in the search warrant were insufficiently particular. Mot. at 20. The Court disagrees. First, as to the gang membership provision, courts have upheld similar gang-indicia provisions against particularity challenges. For example, in *United States v. Martinez*, 2014 WL 3956677 (N.D. Cal. Aug. 12, 2014), the search warrant at issue authorized seizure of:

> Evidence of gang membership to include Norteno gang indicia specifically clothing, writing, objects, graffiti depicting gang participants names, logos, slogans, affiliation, activity, identity, drawings, photographs and photograph albums depicting persons, vehicles or weapons, or location which may appear to be relevant on the question of gang participation or association, or which may depict items believed to be evidence in the case being investigated with this warrant.

*Id.* at *8. In *Martinez*, United States District Judge William H. Alsup of the Northern District of California rejected the defendant's argument that the search warrant was "insufficiently particular with respect to its search of gang indicia," finding that the gang-indicia provision was valid because it "objectively describ[ed] those items in relation to [the defendant's] gang membership." *Id.* at *7–8; *see also United States v. Cerna*, 2010 WL 5387694, at *4 (N.D. Cal. Dec. 22, 2010) (upholding a similar gang-indicia provision that authorized seizure of, inter alia, "clothing consistent with affiliation of membership in MS-13," against a particularity challenge).

This Court similarly concludes that the gang membership provision of the search warrant in the instant case was "sufficiently particular as to the items of gang indicia to be seized."

16

*Martinez*, 2014 WL 3956677 at \*8. At first glance, while some of the sub-categories within the gang-indicia provision of the search warrant are rather descriptive (for example, the "writings, letters, and/or newspapers" category), other sub-categories appear to be more vague (like the "clothing" sub-category). However, any apparent lack of particularity in these latter sub-categories was cured by Deputy Creager's search warrant affidavit, which, as discussed above, identified various symbols and clothing characteristics that are suggestive of an association with the Norteno street gang. Mot. Exh. H at 6; *see also United States v. Bergren*, 2014 WL 1217981, at \*6 (N.D. Cal. Mar. 21, 2014) ("Gang indicia, by its nature, is not amenable to a detailed description."); *Cerna*, 2010 WL 3749449, at \*14 ("By its nature, gang-related indicia may include a broad swath of 'everyday' or 'ordinary' items that only become gang-related indicia in certain contexts or once certain modifications or inscriptions are made to the items.").

Second, Defendant's particularity challenge to the "dominion and control" provision is also without merit. Like with the gang-indicia provision, courts have repeatedly upheld "dominion and control" provisions that are materially identical to the one in the instant search warrant. *See, e.g.*, *United States v. Cisneros*, 154 F. App'x 591, 592 (9th Cir. 2005) (rejecting a particularity challenge to a provision of a search warrant authorizing seizure of "any evidence of the identity of the persons having dominion and control over the premises searched"); *United States v. Khan*, 2013 WL 1384994, at \*2, \*12 (E.D. Cal. Apr. 4, 2013) (rejecting a particularity challenge to a search warrant provision authorizing seizure of "any items tending to establish the identity of those with dominion and control over the premises," but agreeing with the defendant's particularity challenges to other provisions of the search warrant); *United States v. Zuniga*, 2010 WL 11579727, at \*6 (E.D. Wash. Jan. 15, 2010) (rejecting a particularity challenge to a search warrant provision authorizing seizure of "any and all documents which show dominion and control over the listed residence").

Defendant also briefly argues that the sub-category in the search warrant "related to digital storage devices"—that is, the sub-category comprised of "[a]ny of the above items stored in an electronic or digital format in any storage device"—was "fatally overbroad." Mot. at 20. In

support of this argument, Defendant points out that the search warrant in the instant case "provided no guidance whatsoever regarding when or how such [digital storage] devices could be searched," despite the fact that these "devices would need to be reviewed to determine their contents, and would unquestionably contain a wealth of private, confidential information." *Id.* (citing *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (en banc), and *In re U.S.'s Application for a Search Warrant*, 770 F. Supp. 2d 1138, 1144–52 (W.D. Wash. 2011).

However, even assuming Defendant is correct that this particular sub-category in the search warrant was "fatally overbroad," *id.*, no suppression of any evidence obtained from Defendant's residence would be warranted. For situations in which only a portion of a search warrant is overbroad or insufficiently specific, the Ninth Circuit has "endorsed a doctrine of severance, which allows a court to strike from a warrant those portions that are invalid and preserve those portions that satisfy the Fourth Amendment." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 707 (9th Cir. 2009) (internal quotation marks omitted). Under this doctrine, severance is appropriate unless "the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search." *Id.* (internal quotation marks omitted). Thus, even if the digital storage device sub-category of the search warrant in the instant case were invalid, the Court would simply strike that sub-category from the search warrant under the doctrine of severance and suppress the evidence obtained pursuant to that sub-category. Further, it does not appear that any of the items obtained from Defendant's residence were seized solely pursuant to the digital storage device provision of the search warrant. Indeed, Defendant does not identify any items that might qualify for suppression if the digital storage device provision of the search warrant was ruled invalid. Thus, even if the digital storage device provision were severed from the search warrant, such severance would not require the suppression of any evidence obtained from Defendant's residence. *See United States v. Steitiye*, 73 F. App'x 908, 911 (9th Cir. 2003) (affirming the denial of a motion to suppress in part because, although a section of the search warrant at issue was overbroad, that section was severable, and no evidence was seized pursuant to that section).

United States District Court
Northern District of California

Accordingly, the Court is not persuaded by Defendant's particularity challenge to the digital storage device portion of the search warrant.

### 2. False or Misleading Statements in the Search Warrant Affidavit

Next, Defendant contends that Deputy Creager intentionally or recklessly included several false or misleading statements in the affidavit that Deputy Creager submitted in support of his application for the search warrant in the instant case. Mot. at 25–30. Based on this contention, Defendant requests an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and argues that the search warrant would not have been issued by the Superior Court for the County of San Benito absent the allegedly false or misleading statements in Deputy Creager's search warrant affidavit. For the reasons stated below, the Court finds that Defendant has failed to sufficiently demonstrate that he is entitled to a *Franks* hearing.

"In *Franks*, the [U.S.] Supreme Court held that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." *United States v. Stanert*, 762 F.2d 775, 780 (9th Cir. 1985) (internal quotation marks omitted). If the defendant makes this substantial preliminary showing, "the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 156.

There is "a presumption of validity" for information in a search warrant affidavit. *Id.* at 171. As a result, the defendant's allegations of falsity must be "more than conclusory," and must be "accompanied by an offer of proof" such as "[a]ffidavits or sworn or otherwise reliable statements of witnesses." *Id.* "Allegations of negligence or innocent mistake" cannot warrant a *Franks* hearing. *Id.* Instead, the defendant must show "deliberate falsehood or . . . reckless disregard for the truth." *Id.* As such, the Ninth Circuit has held that a "lack of an affidavit or sworn statement offering proof of deliberate falsehood . . . is enough in itself to defeat [a] demand for an evidentiary hearing" under *Franks*. *United States v. Ruddell*, 71 F.3d 331, 334 (9th Cir. 1995). In other words, under Ninth Circuit law, a defendant cannot be granted a *Franks* hearing

United States District Court
Northern District of California

unless he has "submitted [an] affidavit offering proof of *deliberate* falsehood or *reckless* disregard for the truth." *United States v. Storm*, 2012 WL 3643845, at *13 (D. Ore. Aug. 23, 2012).

Defendant challenges three groups of statements in Deputy Creager's search warrant affidavit as false or misleading. The Court addresses each group in turn.

First, Defendant asserts that "[t]he statements regarding the Huelga bird, roman numerals, and numbers were materially misleading and irrelevant, because [Defendant] did not display those identifiers." Mot. at 23. Deputy Creager's affidavit did explain that "members of the Norteno criminal street gang often show their allegiance to the gang by displaying the Huelga Bird . . . the Roman numeral XIV, the roman numeral IV, the number 4, [and] the number 14," Mot. Exh. H at 6, and the government concedes that these characteristics "d[id] not apply to Defendant." Opp. at 16. However, the fact that Defendant lacked these features does not mean that Deputy Creager's inclusion of a description of these features in his affidavit was misleading. As the government notes, "[t]here is nothing wrong . . . with an expert demonstrating his knowledge of a subject before delving into the specifics of a given case."[1] Opp. at 16. Further, "[i]mmediately after the affidavit's general description of Norteno characteristics, Deputy Creager provided a clear list of the specific facts applicable to Defendant himself." *Id.* Specifically, Deputy Creager noted in his affidavit that Defendant (1) was wearing a "Cincinatti [sic] Reds baseball hat with a red letter 'C' and a red bill"; (2) had "money symbol" tattoos on his left shoulder and right forearm; (3) "had a brown wallet depicting the letters 'SF' inside of his vehicle"; (4) had a "red protective case" for his white cell phone; and (5) "advised that he houses in 'B' pod" at the county jail, all of which, according to Deputy Creager, were suggestive of an association with the Norteno criminal street gang. Mot. Exh. H at 6. In light of this "clear list of the specific facts applicable to Defendant himself," Opp. at 16, Defendant has failed to make a substantial preliminary showing that "[t]he

---

[1] Further, as the Court explained above in addressing Defendant's particularity challenges, Deputy Creager's description of the Huelga Bird, roman numerals, and numbers in his affidavit might have been necessary for purposes of ensuring that certain provisions of the search warrant—like the sub-category authorizing seizure of "[c]lothing related to association or membership in a criminal street gang," Mot. Exh. H. at 3—were "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *Spilotro*, 800 F.2d at 963.

1  statements regarding the Huelga bird, roman numerals, and numbers were materially misleading."

2  Mot. at 23.  Further, and in any event, Defendant does not point to anything that suggests that

3  Deputy Creager included these statements with an *intent* to mislead or a reckless disregard for the

4  truth. *See Storm*, 2012 WL 3643845 at *13 (stating that a *Franks* hearing is not warranted unless

5  the defendant has "submitted [an] affidavit offering proof of *deliberate* falsehood or *reckless*

6  disregard for the truth").

7  Second, Defendant takes issue with a statement contained in the following portion of

8  Deputy Creager's search warrant affidavit:

9
> It should be noted that I was present when jail staff asked [Defendant] where he
10 > houses when he stays at the county jail.  [Defendant] advised that he houses in
> "B" pod.  Based on my training, knowledge and experience, I know that "B" pod
11 > is where Norteno gang members are housed.  I also confirmed that "B" pod was
> still a pod where Nortenos were being housed with jail staff on the day
12 > [Defendant] was booked.

13 Mot. Exh. H at 6.  Specifically, Defendant argues that Deputy Creager's statement that "'B' pod is

14 where Norteno gang members are housed" in the county jail, "while technically true," was

15 "intentionally misleading in that it [falsely] implies [that] *only* Nortenos[] are house[d]" in the "B"

16 pod.  Mot. at 23.  In support of his argument, Defendant submits an affidavit from Joshua Mason,

17 an "expert in urban, prison & gang culture" and former "street and prison gang member" retained

18 by Defendant.  Mot. Exh. K at 2.  In his affidavit, Mr. Mason states that:

19
> Deputy Creager misrepresents the significance of [Defendant's] desire to be in B
20 > Pod of the county jail.  In being housed in B Pod, as long as [Defendant] is not an
> *enemy* of the Northerners he will be allowed by fellow inmates to remain without
21 > being under obligation to join a gang.

22 *Id.* ¶ 15.

23 Contrary to Defendant's view, the Court finds that Deputy Creager's statement regarding

24 Nortenos being housed in "B" pod did not "impl[y] [that] *only* Nortenos are house[d]" in "B" pod.

25 Mot. at 23.  Rather, at the very most, Deputy Creager's statement implied that all the Nortenos in

26 the county jail were housed in "B" pod.  Indeed, Deputy Creager's statement that he "confirmed

27 that 'B' pod was still *a* pod where Nortenos were being housed" could even be reasonably read to

28

indicate that "B" pod was *one of several* pods in the county jail where Nortenos were housed. Mot. Exh. H at 6 (emphasis added). Clearly, neither of these implications is equivalent to, or even suggestive of, the notion that "B" pod was *exclusively* comprised of Nortenos. As a result, Defendant has failed to make any "preliminary showing"—let alone a "substantial preliminary showing"—that Deputy Creager falsely implied in his affidavit that *only* Nortenos were housed in the "B" pod of the county jail. *Stanert*, 762 F.2d at 780.

Third and finally, Defendant argues that Deputy Creager "misidentified two common dollar sign tattoos as anti-sureno tattoos, and hence Nortenos gang tattoos." Mot. at 23. Specifically, Deputy Creager stated in his search warrant affidavit that Defendant had multiple "money symbol" tattoos on his left shoulder and right forearm, and that those tattoos were suggestive of gang affiliation because "[t]he letter 'S' with lines through it is a sign of disrespect to the Sureno criminal street gang." Mot. Exh. H at 6. Defendant asserts that Deputy Creager's characterization of these "money symbol" tattoos as gang-related "is plainly not true." Mot. at 23. Again, Defendant refers to Mr. Mason's affidavit for support. *Id.* In his affidavit, Mr. Mason concedes that "Deputy [] Creager is correct when he states that . . . [t]he letter S with lines through it is a sign of disrespect to the Sureno criminal street gang." Mot. Exh. K ¶ 7. However, Mr. Mason then contends that Defendant's "money symbol" tattoos are clearly distinct from the "'crossing out' done by Northerners," and explains that "[t]he crossing out Deputy Creager is referencing" usually manifests as an S that "is crossed out with a single line or by writing a K over it . . . or an X, and not a double vertical line as found on [Defendant's] tattoos." *Id.* Mr. Mason also notes that "[t]he dollar symbol is also found in [Sureno] artwork." *Id.* Additionally, Mr. Mason points out that Defendant "has multiple tattoos with the letter S in them," and asserts that "[b]y Deputy Creager's rationale, [Defendant] should have struck out the S in those words as well, yet they are not [struck out]." *Id.* ¶ 8. Based on these observations, Mr. Mason concludes that "Deputy Creager's statement . . . that [Defendant's] 'money symbol' tattoos were gang related was clearly erroneous." *Id.* ¶ 10.

The Court is not persuaded by Defendant's argument. As an initial matter, it is unclear

22

whether Mr. Mason's affidavit is even sufficient to make a "substantial preliminary showing" that Deputy Creager's statement about Defendant's "money symbol" tattoos was actually incorrect. *Stanert*, 762 F.2d at 780. As the government notes, reasonable people drawing from different experiences and backgrounds "can differ about the significance of" certain clothing or tattoos. Opp. at 16. Although Mr. Mason raises a variety of points to counter Deputy Creager's tattoo statement, it is unclear whether this is enough to make a substantial preliminary showing that Deputy Creager's characterization of Defendant's "money symbol" tattoos was categorically false as an empirical matter.

More importantly, and in any event, the Court finds that Mr. Mason's affidavit falls well short of making a "substantial preliminary showing" that Deputy Creager's statement about Defendant's "money symbol" tattoos amounted to an "*intentionally* or *recklessly* false statement[]." *Stanert*, 762 F.2d at 780 (emphases added). Mr. Mason's affidavit focuses on providing reasons to believe that Deputy Creager was severely mistaken about Defendant's "money symbol" tattoos, but offers nothing beyond that to support Defendant's assertions of "*deliberate* falsehood or *reckless* disregard for the truth" on the part of Deputy Creager. *Storm*, 2012 WL 3643845 at *13. In other words, even assuming that Deputy Creager's statement about Defendant's "money symbol" tattoos was incorrect, Mr. Mason's affidavit provides little evidence that the false statement was anything more than a good faith mistake. As a result, Defendant's argument regarding Deputy Creager's tattoo statement is unavailing. *See Ruddell*, 71 F.3d at 334 (holding that a "lack of an affidavit or sworn statement offering proof of *deliberate* falsehood . . . is enough in itself to defeat [a] demand for an evidentiary hearing" under *Franks* (emphasis added)).

In sum, Defendant has failed to make a "substantial preliminary showing" that Deputy Creager's search warrant affidavit contained any "intentionally or recklessly false statements." *Stanert*, 762 F.2d at 780. Accordingly, the Court DENIES Defendant's request for a *Franks* hearing.

### 3.  Tainted Evidence

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant also argues that the evidence obtained from Defendant's residence should be suppressed because the search warrant that was issued for Defendant's residence "was the fruit of tainted evidence." Mot. at 14. In other words, Defendant's argument appears to be that all of the evidence seized pursuant to the search warrant should be suppressed because the search warrant would not have been issued but for two particular pieces of allegedly "tainted evidence": (1) the firearm that was found in the center console of Defendant's vehicle; and (2) Defendant's statement about being housed in "B" pod in the county jail. *See id.* The Court discusses these pieces of evidence in turn.

First, as to the firearm found in Defendant's center console, Defendant appears to assert that (1) the firearm was "tainted evidence" that should be suppressed; (2) the search warrant "would not have been sought"—and thus would not have issued—"absent the discovery of the firearm"; and therefore (3) all of the evidence obtained pursuant to the search warrant should also be suppressed. *Id.* Consequently, Defendant's argument hinges on Defendant's assertion that the firearm was "tainted" because it was discovered via an unlawful search of Defendant's vehicle. However, as the Court explained in detail above, the entirety of Deputy Creager's search of Defendant's vehicle was valid under the automobile exception, which means that Deputy Creager had ample probable cause to search the portion of the center console in which the firearm was eventually found. As a result, the firearm that was seized from Defendant's car did not amount to "tainted evidence," and therefore cannot serve as a basis for suppressing any of the evidence obtained pursuant to the search warrant in the instant case.

Second, Defendant argues that Defendant's statement "during booking that he houses in 'B' pod" of the county jail "must be purged" from Deputy Creager's search warrant affidavit. Mot. at 14. As discussed above, Deputy Creager stated in his affidavit that "[i]t should be noted that I was present when jail staff asked [Defendant] where he houses when he stays at the county jail. [Defendant] advised that he houses in 'B' pod." Mot. Exh. H at 6. Defendant argues that, because he was not given *Miranda* warnings before being asked about where he houses in the county jail, his answer regarding being housed in "B" pod "must be purged" from Deputy

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Creager's search warrant affidavit. Mot. at 14. By extension, Defendant appears to argue that all of the evidence obtained pursuant to the search warrant should be suppressed because the warrant would not have been issued absent Defendant's statement about being housed in "B" pod. *See id.*

The Court is not persuaded by Defendant's argument. As Defendant admits, Defendant was asked about where he houses in the county jail "during booking." Mot. at 14. It is well-established that "questions to secure the biographical data necessary to complete booking or pretrial services" are exempt "from *Miranda*'s coverage" under the "booking questions exception." *Pennsylvania v. Muniz*, 496 U.S. 581, 601 (1990). This exception exists because *Miranda*'s motivating concerns for "procedural safeguards effective to secure the privilege against self-incrimination," *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), are often inapplicable in the context of booking questions because such questions "rarely elicit an incriminating response." *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990). In the instant case, Defendant was asked by jail staff about where he houses in the county jail during booking because such information was useful for "complet[ing] [Defendant's] booking" in the jail. *Muniz*, 496 U.S. at 601. Thus, under the booking questions exception to *Miranda*, Defendant was not required to be Mirandized before being asked about where he houses in the county jail.

Defendant appears to argue that the booking questions exception is inapplicable to the instant case because the jail staff's question about where Defendant houses in the county jail *was* likely to elicit an incriminating response from Defendant. Specifically, Defendant relies on *United States v. Williams*, 842 F.3d 1143 (9th Cir. 2016). Mot. at 14. *Williams* involved a defendant who was arrested for murder, "taken to county jail and placed in a holding cell," and then "removed . . . from the [holding] cell" by a deputy sheriff and directly "asked whether he was a gang member." *Id.* at 1145. "In response to the deputy's inquiry whether he was affiliated with the Fillmore/Central Divisadero Playas ('CDP') gang," the defendant answered in the affirmative. *Id.* at 1145–46. However, no *Miranda* warnings were ever issued to the defendant during this exchange. *See id.* The Ninth Circuit affirmed the suppression of the defendant's answer under *Miranda*. *See id.* at 1450. In doing so, the Ninth Circuit rejected the government's reliance on the

25

booking questions exception to *Miranda*. *Id.* at 1147–49. Specifically, the Ninth Circuit stated that "[q]uestions about [the defendant's] gang affiliation were . . . reasonably likely to elicit an incriminating response" because "gang membership exposes a defendant to a comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs." *Id.* at 1147 (internal quotation marks omitted). The Ninth Circuit further noted that "[t]he risk that information about gang affiliation will prove incriminating" was especially salient in *Williams* because the defendant was "charged in California with murder, a crime that the state's Supreme Court has acknowledged is frequently committed for the benefit of criminal street gangs." *Id.* at 1148.

Defendant's reliance on *Williams* is unavailing. Unlike in *Williams*, Defendant was never directly "asked whether he was a gang member." *Id.* at 1145. Instead, Defendant was only asked where he typically houses in the county jail. As even Defendant himself insists, where one houses in the county jail does not necessarily "constitute[] evidence of gang affiliation." Mot. at 14. Indeed, Defendant's own gang expert, Mr. Mason, states in his affidavit that people who are *not* gang-affiliated can still be housed in "B" pod, where Defendant was housed, so long as they are not enemies of the Nortenos. Mot. Exh. K ¶ 15. Thus, although housing location within the county jail may correlate with gang membership, Defendant himself contends and provides evidence demonstrating that one's jail pod placement is far from dispositive of one's gang membership or affiliation. As a result, the Court agrees with the government that the question Defendant was asked during booking about where he typically houses in the county jail "d[id] not carry the same risk of incrimination as" the "questions expressly [and directly] seeking admission of gang membership" in *Williams*. Opp. at 11 n.4. Therefore, the booking questions exception applies to the instant case, and thus Defendant was not required to be Mirandized before being asked about where he houses in the county jail.

Accordingly, the Court concludes that Defendant's argument that "the search warrant was the fruit of tainted evidence" is without merit. Mot. at 14–15. Consequently, no suppression is warranted on the basis of that argument.

United States District Court
Northern District of California

### 4. Probable Cause

Finally, Defendant argues that all of the evidence seized from Defendant's residence should be suppressed because the search warrant was unsupported by probable cause. Mot. at 15–19. The government counters that the search warrant in the instant case was supported by probable cause. Opp. at 13–14. In the alternative, the government relies on the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984). Specifically, the government asserts that at a minimum, even if the search warrant was not supported by probable cause, Deputy Creager's search warrant affidavit presented "'a colorable argument for probable cause,'" and thus suppression is not required because the search of Defendant's residence was conducted in good faith reliance on the search warrant. Opp. at 16–18 (quoting *United States v. Krupa*, 658 F.3d 1174, 1179 (9th Cir. 2011)). For the reasons stated below, the Court agrees with the government that no suppression is warranted because, at the very least, there was enough information in Deputy Creager's search warrant affidavit to trigger the good faith exception.

Under the well-established "exclusionary rule," "evidence seized during an unlawful search cannot constitute proof against the victim of the search." *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007). However, in *Leon*, the United States Supreme Court "set out an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant." *Crews*, 502 F.3d at 1135–36 (citing *Leon*, 468 U.S. at 925). This good faith exception recognizes that the exclusionary rule is designed "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974). Thus, the good faith exception accounts for the fact that, when an officer acts in an objectively reasonable manner, "[e]xcluding the evidence can in no way affect his future conduct unless it is to make him to do his duty." *Leon*, 468 U.S. at 920.

"For the good faith exception to apply," the officers who conducted the search "must have relied on the search warrant in an objectively reasonable manner." *Crews*, 502 F.3d at 1136 (citing *United States v. Clark*, 31 F.3d 831, 835 (9th Cir. 1994)). This means that the affidavit

27

supporting the search warrant must have established "at least a colorable argument for probable cause." *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006). On the other hand, reliance on a search warrant "is *per se* unreasonable" where (1) "an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement"; (2) "the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a 'rubber stamp' to the warrant application rather than as a neutral and detached official"; (3) "the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid"; or (4) "the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith." *Crews*, 502 F.3d at 1136 (citing *Leon*, 468 U.S. at 923–26). Thus, the existence of any one of these circumstances automatically renders the good faith exception inapplicable. *See id.*

The Court finds that the good faith exception applies in the instant case because Deputy Creager's search warrant affidavit contained enough information to establish "at least a colorable argument for probable cause" to search Defendant's residence. *Luong*, 470 F.3d at 903. As discussed above, the search warrant in the instant case authorized seizure of firearms from Defendant's residence. *See* Mot. Exh. H at 3–4. Because Defendant had been convicted of misdemeanor domestic violence under California Penal Code § 243(e)(1) in 2012, *see* ECF No. 1 at 2, it would have been a crime under both state and federal law for Defendant to own or possess a firearm. *See* Cal. Penal Code § 29805(a); 18 U.S.C. § 922(g)(9). Deputy Creager's search warrant affidavit contained information that, when considered in conjunction, indicated that Defendant's residence might contain firearms that were owned by Defendant. Specifically, Deputy Creager's affidavit noted that (1) Deputy Creager had found a firearm hidden inside the center console of Defendant's vehicle under a loose panel; (2) there were numerous details about Defendant that collectively suggested a possible affiliation with the Norteno street gang, including "money symbol" tattoos, a "Cincinatti [sic] Reds baseball hat with a red letter 'C' and a red bill," a "red protective [cell phone] case," a "wallet depicting the letters 'SF,'" and the fact that Defendant

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

housed in "B" pod in the county jail, which is also "where Norteno gang members are housed" in the jail; and (3) based on Deputy Creager's "training, knowledge, and experience," which included "hundreds of gang related arrests and investigations," Deputy Creater knew that gang members often possess many weapons in order to commit crimes and protect themselves from members of rival gangs. Mot. Exh. H at 6, 8, 10. Taken together, these facts established more than a "colorable argument for probable cause" to believe that firearms would be found at Defendant's residence. *Luong*, 470 F.3d at 903.

Further, the search warrant in the instant case also authorized seizure of certain "[e]vidence of [g]ang membership," including gang-related clothing, music, photographs, and writings, from Defendant's residence. Mot. Exh. H at 3–4. In turn, Deputy Creager's search warrant affidavit included facts that indicated that Defendant's residence might contain indicia of gang membership or affiliation. Specifically, as discussed above, Deputy Creager's affidavit noted numerous details about Defendant—like Defendant's "money symbol" tattoos and the fact that he housed in "B" pod in the county jail—that collectively suggested an affiliation with the Norteno street gang. *See* Mot. Exh. H at 6. These facts were more than sufficient to establish a "colorable argument for probable cause" to believe that Defendant's residence would contain further evidence of gang membership or affiliation. *Luong*, 470 F.3d at 903.

Consequently, it was not objectively unreasonable to search Defendant's residence for firearms and evidence of gang membership in reliance upon the search warrant. As a result, the good faith exception to the exclusionary rule precludes suppression in the instant case.

In his reply, Defendant insists that the good faith exception cannot be applied to this case. Specifically, Defendant appears to argue that reliance on the search warrant in the instant case was *per se* unreasonable because (1) Deputy Creager's search warrant affidavit "was so lacking in indicia of probable cause that law enforcement could not reasonably rely on it"; (2) "the magistrate was misled by intentional or reckless falsity or omission"; and (3) "the warrant was facially deficient in failing to particularize the items to be seized." Reply at 14–15. However, the Court has already considered and rejected all of these arguments. First, with regards to

Defendant's probable cause argument, as the Court just explained at length, Deputy Creager's search warrant affidavit established more than a "colorable argument for probable cause" to search Defendant's residence for firearms and certain evidence of gang membership. *Luong*, 470 F.3d at 903. Second, as to Defendant's allegations that Deputy Creager included intentionally or recklessly misleading statements in his search warrant affidavit, the Court concluded above that Defendant has failed to make the "substantial preliminary showing" of intentional falsehood or reckless disregard for the truth that is necessary to trigger a *Franks* hearing. *Stanert*, 762 F.2d at 780. Finally, as to Defendant's particularity arguments, the Court has already found that (1) all but one of the search warrant's provisions were plainly sufficiently particular; and (2) even if the remaining provision was invalid, that provision is severable, and its severance would not require the suppression of any of the evidence obtained from Defendant's residence. *See Steitiye*, 73 F. App'x at 911 (affirming the denial of a motion to suppress in part because, although a section of the search warrant at issue was overbroad, that section was severable, and no evidence was seized pursuant to that section).

Defendant also argues that no objectively reasonable officer would have believed that there was probable cause to search Defendant's residence for evidence of gang membership because (1) "'[g]ang membership, standing alone, is not a crime,'" Mot. at 15 (quoting *People v. Elizalde*, 61 Cal. 4th 523, 539 (2015)); and (2) Defendant's possible gang affiliation was not relevant or in any way related to any crime that Defendant was suspected of committing. *See id.* at 15–16. The Court is not persuaded. Although Defendant is correct that gang membership is not a crime in and of itself, there are situations in which "evidence regarding [a defendant's] gang affiliation [c]ould prove helpful in prosecuting" the defendant for a crime. *Messerschmidt v. Millender*, 565 U.S. 535, 551 (2012). For example, evidence of a defendant's gang membership might "help to establish [a] motive" for committing a crime. *Id.* Additionally, such evidence, if "found at [a defendant's] residence," may help "demonstrat[e] [the defendant's] connection to other evidence found" at the residence. *Id.* at 552.

In the instant case, it appears that the evidence of gang membership obtained from

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant's residence could potentially "prove helpful in prosecuting" Defendant for possessing a firearm as a convicted domestic violence misdemeanant—which, as discussed above, is a crime under both California and federal law. *Id.* at 551; *see* Cal. Penal Code § 29805(a); 18 U.S.C. § 922(g)(9). Specifically, if Defendant were to disclaim ownership and possession of the firearms found in his home, the government could plausibly attempt to rebut that argument by using the evidence of gang membership found in Defendant's home to (1) "demonstrat[e] [Defendant's] connection to" the firearms; and (2) suggest a motive for owning multiple firearms (i.e., protection against members of rival gangs), thereby making it seem more probable that the firearms obtained from Defendant's home actually belonged to Defendant. *Messerschmidt*, 565 U.S. at 551–52. At the very least, it would not have been objectively unreasonable for the law enforcement officers in the instant case to believe that evidence of Defendant's possible gang membership could "prove helpful in prosecuting" Defendant in these ways. *Id.* at 551. As a result, the search for evidence of gang membership at Defendant's residence was valid under the good faith exception.

## III.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion to suppress.

**IT IS SO ORDERED.**

Dated: August 14, 2018

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 17-CR-00257-LHK-1
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS